UNITED STATES DISTRICT COURT          SOUTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| Flint Hills Resources, LP, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| *versus* | § | Civil Action H-06-1610 |
| | § | |
| JAG Energy, Inc., *et al.*, | § | |
| | § | |
| Defendants. | § | |

# Findings of Fact and Conclusions of Law

### *Contract.*

1.  In November of 2005, Flint Hills Resources, LP, through its legal department, approved JAG Energy, Inc., as a supplier.

2.  From December 1, 2005, through July 1, 2006, Flint Hills agreed to buy at least 30,000 barrels of condensate each month from JAG.

3.  The agreement could be cancelled by either party, effective at the end of the first full month after written notice.

4.  The condensate was understood to be from the open market but with origins in Mexico. Because Mexican mineral resources are nationalized, the origin of all production from Mexico is ultimately the state oil company, Petroleos Mexicanos, S.A., commonly known as Pemex.

5.  The contract did not oblige JAG routinely to furnish title documents for its deliveries to Flint Hills.

6.  JAG delivered condensate to Flint Hills under the agreement from December 1 until March 24.

### *Breach.*

7.  Two buyers for Flint Hills had lunch with a salesman from PMI Trading, the international

marketing company for Pemex.  At lunch, he told the buyers vague stories about thefts of oil in Mexico.  He was selling Flint Hills naptha.  He told the women that they should be careful but that PMI and he "did not want to get involved."

8.    He mentioned neither JAG or any other company.  He worked for the company from which the condensate would have been stolen.

9.    Based only on this flippant, insubstantial comment, Flint Hills refused JAG's delivery of condensate on March 24 and later.

10.   Flint Hills refused to pay JAG for deliveries of condensate it had accepted before March 24.

*Non-Payment.*

11.   On March 29, 2006, Flint Hills breached its contract with JAG when it refused to pay for condensate it had accepted in December of 2005 and the first three months of 2006.

12.   Flint Hills treated the condensate as if it had good title; it sold the condensate to another company.

13.   Flint Hills had the opportunity to withhold payment in "the event of any adverse claim, lien, dispute or lack of information affecting" title.  At no time, did an adverse claim exist to condensate delivered by JAG to Flint Hills.

14.   Without an adverse claim to the condensate, Flint Hills' non-payment was commercially unreasonable.

15.   Flint Hills sent inquiries to its internal, Washington, and Mexico counsel.  None of them had information about thefts from Pemex, and none of them gave a reasoned, factually-specific response to the putative question of JAG's title.

16.   On May 23, Flint Hills received the report of the independent counsel whom it hired to investigate the controversy it had created by its irrational reaction to the salesman's malicious gossip.  That lawyer, Toby Vick, concluded that Flint Hills had no reasonable basis for non-payment or rejection.  Flint Hills persisted in opposing disbursement of the funds to JAG after it had this confirmation of its own error.

17.   Flint Hills wrongfully withheld the proceeds of the deliveries from JAG that it had accepted.

*Rejection.*

18. Flint Hills breached the contract when it rejected additional condensate on March 24 through July 1 .  Flint Hills had no commercial basis to reject the condensate.  The absence of an adverse claim or plausible factual support for a question of title made Flint Hills' arbitrary quibbling about the sequence of sales categorically unreasonable.

19. The production from Mexican wells, as well as American ones, is sold through brokers, dealers, and traders who may have title for the time it takes to send the next e-mail message.

20. Flint Hills did not investigate the salesman's slander of his competitor.  It did not call the Pemex plant that it knew to have been the source and with which Flint Hills had continuing business.

21. The law firm of Miller and Chevalier – retained by Flint Hills – only confirmed what it already knew – trafficking in stolen property is illegal.  The law firm never verified that Pemex was losing condensate to theft or that anyone in South Texas was known to be trafficking in stolen condensate.  Its Mexican counsel also could confirm no fact about condensate thefts; it repeated rumors of investigations.  People in Mexico steal.  People in the United States steal.  People in both places investigate internal and external losses.  None of those states of nature is a predicate for disputing     JAG's integrity or, more fundamentally, its title.

22. Toby Vick concluded that Flint Hills had no reasonable basis to question title; at trial, he testified incredibly that Flint Hills was in danger of being prosecuted for trafficking in stolen goods and other crimes.  His opinion was untethered to the very facts that he developed in concluding that Flint Hills was arbitrary in its rejection of the deliveries by JAG.  His testimony was that Flint Hills had facts that supported criminal intention beyond a reasonable doubt even though he had represented in writing that he found no facts to support the far lesser standard of commercial reasonableness.

23. Flint Hills routinely buys production from Pemex – including its condensate and naptha – from an initial Mexican trader who sells it into the American market, where JAG bought its supplies for Flint Hills.

24. JAG was reasonable in not promptly revealing its suppliers because as an intermediary trader its business depends on its knowledge of sources.

25. Because Flint Hills had both no knowledge and no intention, it could not have been guilty of a crime.

26. Flint Hills breached its contract with JAG by rejecting deliveries after March 24.

*Cover.*

27. When Flint Hills rejected deliveries of condensate, JAG lost the sales revenue for the last week of March through June of 2006.

28. For the last week of March and for May and June, JAG lost the difference between its cover sales and its contract price with Flint Hills.

29. JAG reasonably mitigated its losses by sales of condensate to Shell Trading United States Company.

30. Based on average sales to Flint Hills of 1,934 barrels per day in March, JAG lost a net margin of $447,434.89 for the last week of March through June of 2006.

*Cancellation.*

31. The contract between JAG and Flint Hills ended July 1, 2006. Although Flint Hills suspended performance the last week of March, it did not notify JAG that it was exercising the cancellation clause until May 16, 2006. Their contract ended thirty days after the first day of the next month – July 1, 2006.

*Interest.*

32. JAG may not recover interest on its attorneys' fees.

*Conclusion.*

33. Operating people at Flints Hills overreacted to a salesman's transparent slander. He knew that Flint Hills was buying from companies like JAG instead of him, so he spit in the soup of their relationships and left. Unfortunately the trader's error was compounded by empty responses by several levels of weak and bureaucratic lawyers. Almost two years after Flint Hills imagined a defect in JAG's title, no claim contrary to JAG has been made

- 4 -

by anyone.  No secondary, contextual facts have arisen that made Flint Hills' rejection plausible even in retrospect.

34.    The loss to JAG was immediate and measurable.  It had to sell its condensate to others below the contract price with Flint Hills.   JAG will recover its commercial loss.


Signed on March 18, 2008, at Houston, Texas.


Lynn N. Hughes
United States District Judge